UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MICHAEL REYNOLDS,              )
                              )
            Plaintiff,         )
                              )
v.                            )      CIVIL ACTION NO.
                              )      16-11119-DPW
STEWARD ST. ELIZABETH'S        )
MEDICAL CENTER of              )
BOSTON, INC., and              )
1199 SEIU UNITED               )
HEALTHCARE WORKERS EAST,        )
                              )
            Defendants.         )


MEMORANDUM AND ORDER
March 7, 2019

Plaintiff, Michael Reynolds, brings this action under Section 301 of the Labor Management Relations Act claiming that a hospital terminated his employment without just cause and that his union breached its duty of fair representation in declining to pursue his grievance to arbitration.

Before me are the Defendants' motions for summary judgment on all of Mr. Reynold's claims as well as their motion to strike portions of Mr. Reynold's affidavit.

## I. BACKGROUND

### A.   *Factual Background[1]*

The union Defendant, **1199 SEIU United Healthcare Workers East** ("the Union"), is an unincorporated labor organization that at all relevant times was the collective bargaining agent for certain non-supervisory employees of the hospital Defendant, **Steward St. Elizabeth's Medical Center of Boston, Inc.** ("the Hospital").

Since approximately 2009, the Union has had a collective bargaining relationship with the Hospital.  Specifically, at all times relevant to this action, the Union and the Hospital were parties to a Collective Bargaining Agreement ("CBA").  The CBA was in effect from October 1, 2009 to September 30, 2013 and

---

[1] I pause to note that in his submissions, Mr. Reynolds has failed expressly to dispute or deny any of the facts set forth in Defendants' Joint Statement of Undisputed Material Facts in Support of Summary Judgment.  Rather, he has submitted his own Statement of Material Facts Which Preclude Summary Judgment. Notably, the majority of the statements from Mr. Reynolds's statement of material facts are lifted straight from his own affidavit.  Various procedural rules, including Local Rule 56.1, "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'"  *Caban Hernandez* v. *Philip Morris USA, Inc.,* 486 F.3d 1, 7 (1st Cir. 2007) (*Calvi* v. *Knox County,* 470 F.3d 422, 427 (1st Cir. 2006)).  "In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated."  *Id.*  Under the circumstances in this case, I will accept Defendants' facts as stated in their joint statement of undisputed material facts giving due consideration to Mr. Reynolds's statement when appropriate.

from October 1, 2013 to October 31, 2016.

1.   The CBA

Article XI, § 11.01 of the CBA (in effect in October 2013) provides, "Any employer covered by this Agreement has the right to discipline, suspend or discharge a worker for Just Cause only, except in the case of a probationary worker who may be terminated without recourse to the Grievance Procedure."

Article XXIV, § 24.03 of the CBA governs the parties' formal grievance and arbitration procedure.  Section 24.03, in part, provides:

**Section 24.03 Formal Procedure:**
In the event of a controversy concerning the meaning or application of any provision of this Agreement, such controversy shall be treated by the Union and the Employer as a grievance and shall be settled, if possible, by the Union, the worker and the Employer as set forth hereafter.  At all Steps of the Grievance Procedure, the worker or delegate will submit the grievance, in writing, explaining as specifically as possible, the nature of the complaint and identify the contract provision(s) affected. Group grievances may be submitted at Step 2.

Step 1 – Department Head/Manager
The worker or Delegate will present a grievance in writing to the Manager or Department Head within twenty (20) working days from the date of the alleged violation of the contract.  The grievance must include the facts, dates, applicable provision(s) of the contract and the remedy requested.

Article XXIV provides further for advancement to Step 2 and Step 3 meetings with representatives of senior management, human

resources, and the Vice President of Human Resources, respectively, should the disagreement remain unresolved.

Section 24.03 of the CBA further provides:

> <u>Arbitration</u>
> In the event that the parties are unable to settle a grievance after the Step 3 or Step 4 process is complete, then either party may request arbitration of said grievance by serving written request for arbitration upon the other party, no later than thirty (30) days following the date of the written answer under Step 3 or within 5 days of terminating the optional Step 4 mediation process.  If either party fails to make a written request for arbitration in this manner within this thirty (30) day period the grievance shall be deemed to have been settled in accordance with the most recent written answer which shall be final and binding on the parties.

## 2.   Relevant Individuals

MaryEllen Leveille has been employed by the Union and its predecessors since 1997.  She currently serves as Vice President of the Union's Steward Health Care System Division.

In 2013, Enid Eckstein held the position as Vice President of the Union's Steward Health Care System Division.  Ms. Eckstein had been employed by the Union and its predecessors since 1989.  She retired in October 2014, at which time Ms. Leveille succeeded her as Vice President.

In July 2013, Ms. Leveille served as the Union's Lead Administrative Organizer ("AO") at the Hospital.  Her responsibilities as Lead AO included negotiating the Union's master contract with Steward Health Care System, administering

the CBA at the Hospital, including by assisting Union delegates, and assisting then-Vice President Eckstein with staff matters and day-to-day duties.  As Lead AO, Ms. Leveille also attended meetings with management on behalf of the Union and represented bargaining unit members throughout the contractual grievance procedure.

Plaintiff, **Michael Reynolds,** was hired by the Hospital as an MRI Technologist ("MRI Tech") in April 2010.   While employed at the Hospital, Mr. Reynolds was a member of the Union and his employment was governed by the CBA.  For the three and a half years of his employment, Mr. Reynolds was supervised by Judith Ierardi, the Operations Manager of Radiology, Radiation Oncology, and the Breast Center at the Hospital.

### 3.   The Contrast Incident

On July 20, 2013, Mr. Reynolds received an order for an MRI which expressly stated "p[atien]t is pregnant and so no contrast."  The order also indicated that it should be for an "MRI BRAIN W/WO CON."  Mr. Reynolds thereafter entered an order in which the statement "patient is pregnant and so no contrast" had been removed.  On that same day, Mr. Reynolds himself injected a pregnant patient with gadolinium-based contrast.

Hospital policy cautioned that "[g]adolinium-based agents should be administered in pregnancy only with extreme caution and avoided if at all possible."  Ms. Ierardi testified that in

her 25 years she "never ha[d] heard of anyone injecting a pregnant patient with contrast."

As a matter of routine where serious discipline was under consideration, Ms. Ierardi telephoned Ms. Leveille to let her know there had been a "very serious incident," in reference to the contrast matter, and that she (Ierardi) would recommend that Reynolds be terminated."  Ms. Leveille engaged Ms. Ierardi in a discussion of the incident and advocated strongly against termination, based on the role two physicians played in the contrast incident and based on lesser discipline that had been issued previously to an MRI tech who had committed a serious error.  Ms. Leveille made clear that the Union would vigorously challenge termination should the Hospital discharge Mr. Reynolds.

On July 26, 2013, Mr. Reynolds attended a disciplinary meeting with Ms. Ierardi regarding the contrast incident.  He was represented by Union delegate, Kristin Knehans.  During this meeting, Ms. Knehans stated that while the contrast incident may be "a fireable offense," the Union would strongly fight against Mr. Reynolds's termination based on the lesser discipline previously issued to an MRI tech who had committed a serious error.

At the conclusion of the disciplinary meeting, the Hospital did not terminate Mr. Reynolds, but issued him a Final Warning

that stated, "[Mr. Reynolds] failed to follow the contrast policy for a pregnant patient in the MRI suite.  This is an egregious violation of the Contrast Medium for Pregnant Policy Rad-02-11, and MRI in pregnancy Policy MR-11 which could have resulted in harm to the unborn infant."  The Final Warning stated that "any other performance or behavioral problems may result in further disciplinary action up to and including termination of employment."[2]

Mr. Reynolds did not grieve the July 26, 2013 Final Warning or request that the Union do so.

### 4.   Performance After the Contrast Incident Leading to His Termination

In August 2013, less than a month after the issuance of his first Final Warning, Mr. Reynolds was the subject of a complaint from a radiology tech aid, Jemilexi Figueroa.  Among other things, Ms. Figueroa complained that there had been several incidents over the prior two months in which she felt that Mr. Reynolds had "harassed and belittled" her and that she had "suffered stress and verbal abuse on numerous occasions" as a result of Mr. Reynolds's behavior.  Mr. Reynolds was not Ms.

---

[2] No disciplinary action was taken against Dr. Ashley Davidoff for authorizing the administration of the gadolinium contract to the pregnant patient, however, he "was told in a very firm way that this was the department policy, only to administer gadolinium to a pregnant patient under dire circumstances or under circumstances considered to be extreme – it has to be used with extreme caution."

Figueroa's supervisor nor did he have any supervisory authority over her.  In his view, she was not doing her job, was lazy, and was there just to collect a paycheck so he had created a list of responsibilities and a check-off list for certain duties to be used by Ms. Figueroa and the other tech aids.

On September 17, 2013, Mr. Reynolds attended another disciplinary meeting with Ms. Ierardi and Human Resources Administrator, Catherine O'Neill,[3] following Ms. Ierardi's receipt of complaints from Ms. Figueroa and other department staff concerning Mr. Reynold's conduct.  Because Mr. Reynolds had expressed dissatisfaction with Ms. Knehans, Ms. Leveille herself accompanied Mr. Reynolds to the meeting.

At the conclusion of the meeting, Mr. Reynolds received a second Final Warning.  This second Final Warning cited Mr. Reynolds for his interactions with Ms. Figueroa and for "not communicating in a respectful collaborative manner with other staff members and creating and disseminating documents surrounding responsibilities and departmental procedures [that] has created an uncomfortable work environment which counteracts the policies set forth by the Medical Center."  It further stated that "[f]ailure to satisfactorily correct the problem(s) as stated in this warning or any further occurrences in the

---

[3]  Catherine O'Neill was formerly known as Catherine Finley.

future of this type or any other performance or conduct
problems, will result in further disciplinary action including
the possibility of suspension and/or termination.  Immediate and
sustained improvement is required."

The Hospital issued Mr. Reynolds a Performance Improvement
Plan ("PIP").  The PIP required Mr. Reynolds to adhere to a 7-
point action plan.  The first point of the PIP required him to
review HR policy HR 5-10, which, among other things, informed
Mr. Reynolds that actions including "[i]nsubordination,"
"[c]onduct contrary to the best interest of St. Elizabeth's, its
patients or employees, while on or off duty," "[v]iolation of
patients' rights/confidentiality," "[v]iolation of computer
security procedures," "[f]ailure to perform required job
responsibilities," "[f]ailure to follow department policies and
policies of St. Elizabeth's Medical Center," or "[i]ntentional
disruption of medical center routine," could result in
disciplinary action up to and including discharge.  The PIP also
required Mr. Reynolds to review the Service Excellence
Standards, which, among other things, informed him that he must
maintain "an atmosphere of friendliness, courtesy and concern
for each patient, visitor, physician and co-worker," provide
patients "with prompt service, always keeping them informed of
delays and making them comfortable while they wait," and treat
all . . . co-workers with respect."

In addition to reviewing HR policies, the PIP also required
that Mr. Reynolds immediately cease from directing the work of
his co-workers or colleagues, refrain from creating and
disseminating documents that list the responsibilities or tasks
of other co-workers, refrain from creating documents that are
meant to instruct co-workers on departmental
policies/procedures, not address concerns he had of his co-
workers' performance directly with his co-workers, immediately
address any concerns he had regarding the performance of his co-
workers with his direct manager, communicate in a collaborative
and respectful way with co-workers, staff members, and patients
throughout the Medical Center, and meet weekly with his manager
to review his progress.  Mr. Reynolds testified that he
understood that a failure to comply with the PIP could lead to
further disciplinary action, including separation from
employment.  Again, Mr. Reynolds did not grieve the second Final
Warning or ask the Union to grieve it on his behalf.

On September 18, 2013, the day following the second
disciplinary meeting, Mr. Reynolds filed an unfair labor
practice charge with the National Labor Relations Board ("NLRB")
against the Union relating to the Final Warning he received in
July 2013.  Specifically, Mr. Reynolds alleged that "[o]n July
28, 2013, my Union Representative failed to represent me by

recommending my termination of employment."  Mr. Reynolds
ultimately withdrew this unfair labor practice charge.

In accordance with the terms of the PIP, Mr. Reynolds was
scheduled to attend a meeting with management on October 4,
2013.  On October 3, 2013, Mr. Reynolds sent an email to Ms.
Leveille "requesting an attorney to represent [him]."  He
indicated that he did "not feel comfortable attending any
further meeting with [his] supervisor and/or H.R. personnel
until [he] ha[d] an attorney present to represent [his]
interests and witness any further discussions."

Ms. Leveille responded within minutes stating, "We do not
provide an attorney for meeting with management or HR.  You have
the right to have a delegate with you under the contract those
are your rights."  Mr. Reynolds replied he "would like the Union
to provide[] [him] with an attorney.  That [that] [wa]s [his]
right, and the NLRB as well as [his] attorney ha[d] already
informed [him] of this entitlement."   Mr. Reynolds never
requested, nor was he denied, a Union delegate at any PIP
meetings.

On October 4, 2013, Mr. Reynolds met with Ms. O'Neill,
Director of Radiology, Ray Wilburn, and Ms. Ierardi, pursuant to
the PIP to discuss several performance deficiencies that had
occurred between their previous meeting and October 4.  Mr.
Reynolds was counseled for making an injured patient wait nine-

and-a-half hours for a scan that was ordered at 8:00 a.m.   He
was also reprimanded for commenting on the status of an injured
football player's knee;  technicians are not permitted to
divulge to a patient that they can read the films or think that
they know what the diagnosis may be.   Mr. Reynolds was also
counseled for leaving the hospital while a patient was waiting
to be scanned.   Additionally, he was counseled for failing to
remove duplicate orders from the computer system and failing to
perform normal stocking and cleaning duties.

Following this meeting, Mr. Reynolds emailed Ms. O'Neill,
Mr. Wilburn, and Ms. Ierardi.   Among other things, Mr. Reynolds
complained that he was not provided with an attorney for the
meeting and concluded the email by stating that management "can
inform me of your future list of grievances [about my work
performance] via email.   Otherwise . . . I will need to have an
attorney – provided to me by the Union – present as witness at
any meetings in the future."

The following day, October 5, 2013, Ms. Ierardi expressed
to Ms. O'Neill and Mr. Wilburn her view that Mr. Reynolds's
refusal to attend future PIP meetings constituted
insubordination and further informed them that she had received
complaints from other techs that Mr. Reynolds "did not
communicate with any of them yesterday, was on his cell phone
and is passive aggressive."   Moreover, that same day, Mr.

Reynolds used a diphenhydramine tablet to counteract a patient's allergic reaction to the contrast medium.  Rather than calling the hospital pharmacy to replace the tablet, he left a sticky-note with a patient's name and the medicine used.

On October 11, 2013, Ms. Ierardi terminated Mr. Reynolds's employment in consultation with Ms. O'Neill and Gail Flynn, Director of Human Resources.  At a meeting, Ms. O'Neill and Mr. Wilburn notified Mr. Reynolds of his termination and explained that his ongoing performance issues and his refusal to attend weekly review meetings with his supervisor constituted violations of his PIP and that the Hospital had "lost faith" in Reynolds as an employee.  Mr. Reynolds was represented by Union delegate, Adam Bezza, at this meeting.

### 5.   The Grievance Process

On October 28, 2013, following Mr. Reynolds's termination, Mr. Bezza filed a grievance on Mr. Reynold's behalf challenging the termination as without just cause.

On November 26, 2013, Ms. Eckstein notified Mr. Reynolds that Union AO, Bruce Fleischer, was assigned to handle his grievance.  In preparation for the Step 2 grievance hearing, Mr. Fleischer took various steps, including: speaking to Mr. Reynolds several times by telephone and email; speaking with Union delegates, Ms. Knehans and Mr. Bezza, as well as Ms. Ierardi and Ms. O'Neill; requesting and obtaining information

from the Hospital related to its decision to terminate Mr.
Reynolds; and reviewing Mr. Reynolds's personnel file, including
the two Final Warnings and the PIP.  Mr. Fleischer familiarized
himself with details of both Final Warnings, but he did not
investigate the underlying facts because they were not grieved
and therefore could not be challenged independently during the
grievance process.

Ms. Flynn heard the Step 2 grievance on January 24, 2014.
Mr. Fleischer reviewed the entirety of Mr. Reynolds's
disciplinary history since the contrast incident and addressed
each allegation to argue that the Hospital did not have just
cause to terminate Mr. Reynolds.  Mr. Reynolds initially felt
supported by Mr. Fleischer.[4]

On February 1, 2014, Mr. Reynolds emailed Mr. Fleischer
about the Step 2 grievance.  In this email, Mr. Reynolds noted
that during the hearing, Ms. Flynn asked about his first Final
Warning and why it was not grieved, and that he and Mr.
Fleischer had "discussed the reason thoroughly."  In his
response, Mr. Fleischer explained that "[u]nfortunately, we
can't change the interactions that went on previously, we need
to figure out the best way forward."

---

[4] Mr. Reynolds later testified that Mr. Fleischer "seemed very
sympathetic to the situation, and he was the first one from the
union that had seemed to see the logic in [his] complaint."

14

Several days later, on February 4, 2014, Ms. Flynn issued a Step 2 grievance response denying Mr. Reynolds's termination grievance.  Mr. Fleischer notified Mr. Reynolds of Ms. Flynn's decision and timely moved the grievance to Step 3.

The Step 3 grievance hearing was held on April 23, 2014. Justin May, in-house counsel for the Hospital, heard the grievance.  As he did at Step 2, Mr. Fleischer reviewed the entirety of Mr. Reynolds's disciplinary history since the contrast incident and addressed each allegation to argue that the Hospital did not have just cause to terminate Mr. Reynolds. Mr. Reynolds later testified that he felt Mr. Fleischer's presentation at Step 3 was full and fair on his behalf.  He also testified that he had the opportunity to give his side of the story in his own words.

At the end of the Step 3 grievance hearing, Mr. Fleischer stated that the Union was open to considering a settlement agreement and Mr. May agreed to consider it upon receipt of a proposal from the Union.  Mr. Fleischer raised the possibility of settlement based on an earlier conversation with Mr. Reynolds in which Mr. Reynolds expressed that he was very open to that possibility.

On May 19, 2014, Mr. May issued a Step 3 grievance response denying Mr. Reynolds's grievance based on his disciplinary history and continued poor performance.

Following receipt of the Step 3 grievance response, Mr.
Fleischer consulted with Ms. Leveille, Ms. Eckstein, and the
Union's legal counsel to determine whether the Union should
advance Reynolds' grievance to arbitration.  Mr. Fleischer
reviewed Mr. Reynolds's file with Ms. Eckstein and expressed his
belief that the Union would not be successful at arbitration
because Reynolds was a short-term employee with several
disciplinary actions and performance concerns on his record.

As Vice President, Ms. Eckstein was the final decision
maker as to whether the Union advanced grievances to
arbitration.  Based on her twenty-five years of experience in
processing grievances and determining their merit, Ms. Eckstein
attempts to examine the record by looking at the relevant
factors in the same way as an arbitrator.  Ms. Eckstein spent
considerable time reviewing Mr. Reynolds's case and discussing
the merits with Mr. Fleischer.  She did not conduct an
independent investigation of the facts underlying the two Final
Warnings because they were not grieved and, therefore, not
relevant to her decision as to whether to proceed to
arbitration.

Ultimately, Ms. Eckstein determined that based on the two
Final Warnings that were not grieved, the Hospital's ongoing
concerns with Mr. Reynolds's poor performance as evidenced by
staff and patient complaints, lack of disparate treatment, and

his failure to fully comply with the terms of the PIP, the Union was unlikely to prevail at arbitration.  Accordingly, Ms. Eckstein decided that the Union would not move Mr. Reynolds's grievance to arbitration.

On May 23, 2014, the Union and the Hospital agreed to extend the time for submitting the grievance to arbitration to allow Mr. Reynolds to exercise his own internal appeal.

On May 27, 2014, the Union advised Mr. Reynolds that it would not submit his grievance to arbitration.

### 6.    The Internal Union Appeal Process

On June 2, 2014, Mr. Reynolds appealed the Union's decision not to arbitrate his termination grievance.

While the Union was in the process of setting up Mr. Reynolds's appeal hearing, Mr. Fleischer and Mr. May discussed the possibility of settling the grievance.  On or about September 2014, the Hospital and the Union reached a tentative settlement that the Union judged to be reasonable.  On September 17, 2014, Mr. Fleischer telephoned Mr. Reynolds and left a message advising him that the Union and the Hospital had reached a settlement the Union considered reasonable and asked Mr. Reynolds to respond.  He sent a letter to Mr. Reynolds the next day conveying the same message.

Shortly thereafter, in a letter dated September 23, 2014, Mr. Reynolds's counsel contacted the Union and alleged that

17

"1199 SEIU United Healthcare Workers East has consistently breached its duty of fair representation to Michael Reynolds by failing to properly pursue his grievance against St. Elizabeth's Health Center."  The next day, Ms. Eckstein responded to Mr. Reynolds's letter, including a copy of the proposed settlement agreement with the letter.  She advised Mr. Reynolds that he had the option of accepting the settlement or proceeding with the internal appeal.

Several months later, on or about January 6, 2015, Mr. Reynolds filed an action in state court, later removed to this court, in which he alleged that the Union "failed to diligently investigate or pursue the Plaintiff's grievance at Step 2 or Step 3 of the grievance procedure," failed "to timely file and pursue arbitration of the Plaintiff's grievance . . .," and that such alleged failure was "arbitrary, capricious and in bad faith."  Mr. Reynolds served his complaint on the Union on or about February 12, 2015.

On February 17, 2015, the Union wrote to Mr. Reynolds's counsel and enclosed again the information concerning the proposed settlement provided in the Union's September 24, 2014 letter.

On February 26, 2015, the Union advised Mr. Reynolds that his internal appeal was still available and confirmed that the

18

Hospital had agreed to arbitrate the termination in the event the Arbitration Appeals Committee directed arbitration.

On April 1, 2015, the Union obtained the Hospital's agreement, in writing, that should the Union's internal process result in a decision to arbitrate Mr. Reynolds's termination grievance, the Hospital would arbitrate the grievance without challenging the timeliness of its submission to arbitration.

On April 14, 2015, the parties agreed that the Union would process Mr. Reynolds's appeal of the Union's decision not to arbitrate his termination grievance.  On that same day, Mr. Reynolds agreed to dismiss *Reynolds* v. *1199 SEIU United Healthcare Workers East & Steward St. Elizabeth's Medical Center of Boston, Inc.,* No. 15-cv-10417 without prejudice.

On April 23, 2015, Mr. Reynolds had his first hearing before the Arbitration Appeals Committee.  At that hearing, Mr. Fleischer defended the Union's decision not to arbitrate Mr. Reynolds's termination grievance.  Mr. Fleischer went through each event leading to Mr. Reynolds's termination, beginning with the first Final Warning that was not grieved, the second Final Warning that was not grieved, and Mr. Reynolds's termination for failing to comply with the terms of the PIP.  He then described each stage of the grievance process, explained why the Union believed that it could not prevail at arbitration, and concluded with the fact that the Union was able to reach a tentative

settlement with the Hospital that it judged to be reasonable. Ms. Leveille and Ms. Knehans were also present to answer the Committee's questions about their involvement in Mr. Reynolds's case.

After Mr. Fleischer's presentation, Mr. Reynolds was afforded an opportunity to present the facts surrounding his termination.  Mr. Reynolds provided the Committee with an affidavit he prepared outlining his position and further explaining the facts from his perspective. The Committee asked him several questions about his case.

On or around May 1, 2015, the Arbitration Appeals Committee Chair, Celia Wcislo, notified Mr. Reynolds that the Committee "voted unanimously to uphold the Union's decision to not move forward to arbitration."  She noted that "the evidence and arguments [Mr. Reynolds] offered did not show that the Union ha[d] a reasonable likelihood of overturning [the Hospital's] decision that there was just cause to terminate [his] employment."  Ms. Wcislo also advised Mr. Reynolds of his right to appeal the decision.

By letter dated May 4, 2015, Mr. Reynolds appealed the Arbitration Appeals Committee's decision.

On September 18, 2015, the Mr. Reynold's second appeal hearing was held before the Union's Massachusetts Regional Hearing and Appeals Board.  Mr. Fleischer again defended the

Union's decision not to arbitrate Mr. Reynolds's termination grievance and Ms. Leveille was present to answer questions about her role in Mr. Reynolds's case.  Mr. Reynolds provided the Appeals Board with the same affidavit he had distributed at the first appeal hearing.  The Board then asked him several questions about his case.

By letter dated September 23, 2015, the Appeals Board notified Mr. Reynolds that the Board "voted unanimously to deny [his] appeal because it was clear that the union would have no reasonable likelihood of prevailing in an arbitration case." The letter further informed Mr. Reynolds that the Hospital was still prepared to honor the tentative settlement agreement it reached with the Union the previous year and requested that Mr. Reynolds notify the Union whether he was interested in accepting the Hospital's offer.

**B.   *Procedural Background***

On March 15, 2016, Mr. Reynolds filed the complaint in this case in the Superior Court for the Commonwealth of Massachusetts on March 15, 2016.  He alleged that the Union "failed to diligently investigate or pursue the Plaintiff's grievance at Step 2 or Step 3 of the grievance procedure," failed "to pursue arbitration of the Plaintiff's grievance . . .," and that such alleged failure was "arbitrary, capricious, and in bad faith."

On June 15, 2016, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, the Hospital removed the case to this court.  The Union filed its consent to removal of the action on June 23, 2016.

In due course, the Union filed a motion for summary judgment on Count I of Mr. Reynolds's complaint.  On the same day, the Hospital filed a motion for summary judgment on both Counts I and II.  The Defendants have also filed a joint motion to strike portions of Mr. Reynolds's affidavit in support of his oppositions to Defendants' motions for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When assessing a motion for summary judgment, "the court must consider the facts in the light most favorable to the party opposing the motion."  *Soar* v. *Nat'l Football League Players' Ass'n*, 550 F.2d 1287, 1289 n.4 (1st Cir. 1977) (citation omitted).

It is well-established that "[c]onventional summary judgment practice requires the moving party to assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality."  *Mulvihill* v. *Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted).  "Once the movant has

22

done its part, the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists." *Id.* (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott* v. *Harris*, 550 U.S. 372, 380 (2007) (citation and internal quotation marks omitted).

### III. ANALYSIS

Before turning to the merits of the summary judgment motion, I must determine what evidence may make up the summary judgment record.  Thus, I address the Defendants' Motion to Strike.

### A.   *Defendants' Joint Motion to Strike*

Defendants claim that portions of Mr. Reynolds's affidavit must be struck because statements asserted therein directly contradict his sworn deposition testimony and/or cannot be considered at summary judgment consistent with Fed. R. Civ. P. 56(c) because they constitute inadmissible hearsay, arguments, or conclusions and are not based on Mr. Reynolds's personal knowledge.

#### 1.   Contradictory Statements

The First Circuit has made clear that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a

satisfactory explanation of why the testimony is changed."
*Colantuoni* v. *Alfred Calcagni & Sons, Inc*., 44 F.3d 1, 4-5 (1st
Cir. 1994).  However, the First Circuit has clarified that "[a]
subsequent affidavit that merely explains, or amplifies upon,
opaque testimony given in a previous deposition is entitled to
consideration in opposition to a motion for summary judgment."
*Gillen* v. *Fallon Ambulance Serv., Inc*., 283 F.3d 11, 26 (1st
Cir. 2002).

> a. *Paragraph 23*

In ¶ 23, Mr. Reynolds asserts, "Following the meeting, I
told Kristin Knehans that I wanted to grieve the final warning."

During his deposition, however, Mr. Reynolds was asked,
"[t]here was testimony yesterday that you didn't grieve either
of the two final warnings, and you didn't ask the union to
grieve either of the two final warnings, did you?"  After some
clarification, his response to this question was, "No."

Mr. Reynold's testimony is a clear contradiction to his
statement in his affidavit stating that he told Ms. Knehans that
he wanted to grieve the final warning.  This sentence in ¶ 23 is
stricken.

In ¶ 23, Mr. Reynolds also wrote, "Kristine Knehans did not
file a grievance on my behalf and I did not follow up on the
matter because she told me the union thought I should be fired."
Defendants call my attention to a portion of Mr. Reynolds's

deposition testimony in which he states that he read the Union's grievance procedure that allows either the worker or the Union delegate to file a grievance on behalf of the worker. Although this testimony accurately depicts what the Union contract provided, it does not portray Mr. Reynolds's understanding at the time. Immediately after the designated testimony, Mr. Reynolds was asked, "So you understood that to mean that you could file a grievance?" He responded, "Not at that time, no, I didn't know how it worked. That is why I went to Kristin for help." Neither Defendants' designated portion of Mr. Reynolds's testimony nor this supplementary statement contradicts Mr. Reynolds's statement in his affidavit. Rather, Mr. Reynolds's response in some ways supplements his statement that Ms. Knehans did not file a grievance on his behalf. Accordingly, I do not find a contradiction here and will not strike this portion of ¶ 23.

> b. *Paragraph 24*

In ¶ 24, Mr. Reynolds stated, "During the September 17, 2013 meeting, MaryEllen Leveille, who was supposed to represent me, repeatedly argued against my position and took St. Elizabeth's position." In his deposition, Mr. Reynolds stated that Ms. Ierardi "wanted an agreement made that [he] felt was unfair, and felt that [Ms. Leveille] should have stood up for [him] and rejected and she didn't." He further indicated that

after he spoke to Ms. Leveille privately about his concerns, "she consented to advocating on [his] behalf."  Mr. Reynolds was then specifically asked, "And when she went into the meeting, she did so; she advocated the position that you had laid out for her?"  He replied, "Yes."  Ultimately, Ms. Leveille succeeded in getting a condition of the PIP changed.  Mr. Reynolds's deposition, although it indicates there may have been some difference of opinion in the beginning between him and Ms. Leveille, maintains that Ms. Leveille did indeed advocate the position that he had laid out for her and did not "argue against his position" at the hearing.  This testimony is contradicted by Mr. Reynolds's subsequent affidavit.

Mr. Reynolds attempts to obscure this specific contradiction by pointing to other instances in his deposition in which he testified that Ms. Leveille had advocated against him.  For example, he contends that he testified that Ms. Leveille was present at the Step 2 meeting "because she was advocating against [him] at the meetings."  Mr. Reynolds fails to recognize that this meeting was different than the September 17, 2013 meeting.  Consequently, I do not find his argument persuasive in this regard and, therefore, I strike this portion of ¶ 24 as contradictory of his deposition testimony.

      *c. Paragraph 32*

In ¶ 32 of his affidavit, Mr. Reynolds avers that, "[o]n or

about November 26, 2013, I contacted Enid Eckstein a Vice-President at SEIU and informed her that I did not want MaryEllen Leveille handling my grievance because I did not believe that she was acting on my behalf but was in fact supporting St. Elizabeth's.  In response, Enid Eckstein sarcastically said, 'you expect the Union to help you after you filed a complaint with the NLRB.'  I was shocked by her statement."

During his deposition Mr. Reynolds was asked, "Did you play any role in that – with respect to making a request concerning who would represent the union in the grievance of your termination?"  He answered, "Well, I was very dissatisfied with [Ms. Leveille's] performance, so I think I probably did request if I could have someone else."  He indicated that he forwarded this request to Ms. Eckstein.  Nothing in his testimony is inconsistent with ¶ 32.  Consequently, I cannot strike this portion of his affidavit.

       *d. Paragraph 34*

In ¶ 34, Mr. Reynolds claimed, "On January 24, 2014, there was a Step 2 hearing on my grievance at which I was represented by Bruce Fleischer.  Gail Flynn, Director of Human Resources for St. Elizabeth's represented the hospital.  During that hearing, the first issue raised by Gail Flynn was the Contrast Incident and I explained that I had done nothing wrong."

Defendants identify the following deposition testimony as contradicting this statement:

> Q. If I represent to you that on January 24, 2014 you attended a step two grievance meeting with Bruce Fleischer representing the union, and Gail Flynn representing the hospital, do you recall that meeting?
>
> A. Those were the only ones there?
>
> Q. (Nods head.)
>
> A. No, I don't.
>
> . . .
>
> Q. So I am asking about, I just want [to] be sure that you have told us everything that you remember, if anything, about the step two meeting with Gail Flynn and Bruce.
>
> A. No, I don't have anything further I can offer.

This designation does not contradict what Mr. Reynolds stated in his affidavit.  Although he did not remember much of the Step 2 meeting at the time of his deposition, there is no reason that he could not have remembered this meeting at a later time, i.e., when he was drafting his affidavit.   Because I find no contradiction between this statement and Mr. Reynolds's affidavit, I will not strike this portion of his affidavit.

### e. Paragraph 35

In ¶ 35, Mr. Reynolds maintains, "On April 23, 2014, there was a Step 3 hearing on my grievance at which I was once again represented by Bruce Fleischer.  Justin May was the hearing officer for St. Elizabeth's.  Once again, one of the main

issue[s] raised by the hearing officer was the contrast
incident."

Defendants have focused my attention on the phrase "by the
hearing officer."  Although Mr. Reynolds's identified deposition
testimony does not indicate that Mr. May raised the contrast
incident, he does indicate that Mr. Fleischer presented the
contrast in pregnancy policies to Mr. May.  In his deposition,
Mr. Reynolds does not unambiguously state that Mr. May was the
one to raise this issue.  On the other hand, his testimony
cannot be read to indicate that it was Mr. Fleischer who raised
the issue.  Therefore, I find no disabling inconsistencies
between Mr. Fleischer's statement and his deposition and will
not strike this portion of his affidavit.

   *f. Paragraph 37*

In ¶ 37, Mr. Reynolds asserts, "[a]fter I received the
[Step 3 grievance] response, I told Bruce Fleischer that I
wanted to arbitrate my grievance.  Bruce Fleischer told me he
didn't believe in arbitration."

During his deposition, Mr. Reynolds was shown his
handwritten notes.  Several questions were asked of him
regarding the meeting he had with Mr. Fleischer.  Mr. Reynolds's
attention was focused on the first line of his notes in which he
wrote, "Bruce F. states he doesn't believe arbitration."  He was
asked whether he recalled what the end of that sentence was and

his reply was, "No."  Mr. Reynolds's notes are in alignment with his statement in his affidavit.  There is no reason for me to find inconsistency on grounds that he could not recall what the end of the sentence was.  Accordingly, I will not strike this portion of his affidavit.

    2.    Hearsay Statements

    Rule 56(c)(4) of the Federal Rules of Civil Procedure states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Therefore, it is well-established that "[a] genuine issue of material fact can be created only by materials of evidentiary quality."  *Hannon* v. *Beard*, 645 F.3d 45, 49 (1st Cir. 2011) (citation omitted).  Accordingly, "hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."  *Id.* (internal quotation marks and citation omitted).

    Defendants argue that Mr. Reynolds's affidavit contains a multitude of statements that are inadmissible as evidence because they are hearsay statements.  The following is a list of the statements that Defendants move to strike:

¶ 7: "Prior to commencement of the MRI study, the [sic] Dr. Samarth S. Chittargi (hereinafter 'Dr. Chittargi') called me and

changed the order and requested that the MRI examination include a pituitary study."

¶ 8: "When Dr. Chittargi told me that he wanted a pituitary study, I told him that I did not think that we could do it and because it would require contrast and the patient was pregnant. I also verbally informed Dr. Chittargi about the hospital's protocol regarding the administration of gadolinium contrast to a pregnant woman which states that 'Gadolinium based agents should be administered in pregnancy only with extreme caution and avoided if at [sic] possible…'".

¶ 9: "Dr. Chittargi, with confidence, firmly informed me that he still wanted the contrast administered to the patient and that he would speak to the patient.  At no time did I tell Dr. Chittargi what test to do or that he had to administer contrast."

¶ 11: "Dr. Chittargi called me back and informed me that the patient was consenting to the examination with contrast and reiterated that he wanted the MRI examination to include contrast.  Dr. Chittargi also stated that he had spoken to Dr. Ashley Davidoff (hereinafter 'Dr. Davidoff') and that he had approved the administration of the contrast."

¶ 12: "I consulted with the covering radiologist, Dr. Davidoff who told me that he had spoken to Dr. Chittargi and that we were going to proceed with the MRI with contrast.  I changed the order in the computer as instructed by Dr. Chittargi to include a pituitary protocol."

¶ 16: "[Dr. Schwartz] reproached me stating that 'we never inject a pregnant patient with gadolinium.'"

¶ 23: "Kristen Knehans told me that there was no use in filing a grievance because the union thought I should be fired for the contrast incident.  Kristin Knehans did not file a grievance on my behalf and I did not follow up on the matter because she told me the union thought I should be fired."

¶ 32: "In response, Enid Eckstein sarcastically said 'you expect the Union to help you after you filed a complaint with the NLRB.'"

¶ 34: "During that hearing, the first issue raised by Gail Flynn was the Contrast Incident and I explained that I had done nothing wrong."

¶ 35: "Once again, one of the main issue raised by the hearing officer was the contrast incident."

¶ 37: "After I received the response, I told Bruce Fleischer that I wanted to arbitrate my grievance.  Bruce Fleischer told me he didn't believe in arbitration."

¶ 44[5]: "At the April 23, 2005 [sic] hearing, both Bruce Fleischer and Mary Ellen LeVeille told the appeal panel that the contrast incident was a fire-able offense and that the union had saved my job.  This was completely false.  Bruce Fleischer and Mary Ellen LeVeille both recommended to the appeal panel that they uphold the decision not to arbitrate my grievance."

¶ 48: "At the September 18, 2015 hearing, Bruce Fleischer and Mary Ellen LeVeille once again both told the appeal panel that contrast incident was a fire-able offense and that the union had saved my job.  Bruce Fleischer and Mary Ellen LeVeille once again both recommended to the appeal panel that they uphold the decision not to arbitrate my grievance."

Mr. Reynolds claims that the third-party statements contained in paragraphs 7, 8, 9, 11, 12, 16, 23, 32, 34, 35, 37, 44, and 48 of his affidavit are not hearsay because they are not offered to prove the truth of the matters contained therein.  I find merit to this argument.  These statements are "verbal acts" and offered, not to show the truth of the matters asserted, but for the fact that the statements were made.  *See Rivot-Sanchez v. Warner Chilcott Co.*, 707 F. Supp. 2d 234, 261 (D.P.R. 2010). Furthermore, these statements are "admissible to the extent 'offered not to prove the truth of the matter asserted but merely to show context — such as . . . what effect the

---

[5] The language quoted here actually comes from the statement in ¶ 46.

statement[s] had on the listener.'"  *Id.* (quoting *United States* v. *Cruz-Diaz,* 550 F.3d 169, 176-77 (1st Cir. 2008)) (alterations in original).  Mr. Reynolds's conversations with Dr. Chittargi and Dr. Davidoff are examples of Mr. Reynolds's establishing the context.  Moreover, his conversations with Ms. Knehans, Mr. Fleischer, Ms. Leveille and Ms. Flynn all show the effect that the statements had on the listener, i.e., Mr. Reynolds himself. Accordingly, I deny Defendants motion to strike with respect to the statements outlined above.

### 3.  Statements Not Based on Personal Knowledge

Affidavits submitted in opposition to a motion for summary judgment that do not "provid[e] specific factual information made on the basis of personal knowledge . . . are insufficient" to defeat summary judgment.  *Santiago-Ramos* v. *Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) (citation omitted).  Nevertheless, a "party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."  *Id*. (quoting *Cadle Co.* v. *Hayes,* 116 F.3d 957, 961 n.5 (1st Cir. 1997)) (internal quotation marks omitted).

Defendants further contend that Mr. Reynolds's affidavit makes numerous statements that are not based on his personal knowledge and are not supported by citations to any competent

evidence.   The following is a list of the statements that

Defendants move to strike:

¶ 9: "Dr. Chittargi, with confidence, firmly informed me that he still wanted the contrast administered to the patient and that he would speak to the patient."

¶ 12: "At St. Elizabeth's, it was common and accepted practice for MRI techs to change orders in the computer on instruction from the ordering physicians."

¶ 18: "Despite my explanation, Dr. Schwartz attempted to place blame on me for administering the gadolinium contrast despite the fact I was instructed to do so by the ordering physician and covering radiologist."

¶ 21: "I believed I was being made a scapegoat by the hospital."

¶ 25: "The second final warning which alleges that I did not communicate with an MRI Aide and other staff members in a respectful collaborative manner is completely false and pre-textual."

¶ 27: "On October 4, 2013, I was called into another meeting and once again was subjected to additional false accusations about my job performance which were all a pretext to fire me."

¶ 28: "The allegations made against me in the October 4, 2013 meeting were completely false and were just another effort by Judith Ierardi to harass me into quitting my job."

¶ 36: "On May 19, 2014, Justin May denied my grievance in part on the grounds of the final written warning I received following the Contrast Incident."

    Mr. Reynolds contends that he is entitled to testify as to his observations of that affect or tone of voice of persons speaking to him, as these statements are based on what he heard and saw.   On these grounds with those limitations, the statements are not subject to a motion to strike because they are all within Mr. Reynolds's personal knowledge.   He was present with the doctors as well as when the meetings occurred

and the final warnings were issued.  Moreover, as an MRI tech,
he was arguably privy to the common and accepted practice for
MRI techs at the Hospital.

Accordingly, I deny Defendants' motion to strike with
respect to the above outlined paragraphs.

### 4.   Argumentative and Conclusory Statements

Affidavits submitted in opposition to a motion for summary
judgment also "'may not contain arguments or conclusory
assertions' that would not be admissible at trial." *Fin. Res.
Network, Inc.* v. *Brown & Brown, Inc.*, 867 F. Supp. 2d 153, 170
(D. Mass. 2012) (quoting *Murphy* v. *Ford Motor Co.,* 170 F.R.D.
82, 85 (D. Mass. 1997)).  "Without any specific factual
knowledge to support [a] statement, it is a mere conclusion that
cannot serve as probative evidence." *Navedo* v. *Nalco Chem.,
Inc.*, 848 F. Supp. 2d 171, 179-80 (D.P.R. 2012).

Defendants claim that Mr. Reynolds's affidavit contains
several arguments and conclusory assertions that would not be
admissible at trial.  The following is a list of the statements
that Defendants move to strike:

¶ 1: "Prior to July 2013, my employment record with St.
Elizabeth's was excellent."

¶ 20: "This Final Warning was completely unwarranted as I had
followed the policy to the letter."

¶ 21: "I was shocked that I had been issued a final warning for
the contrast incident as I had completely and precisely followed

St. Elizabeth's protocol.  I believed I was being made a
scapegoat by the hospital."

¶ 24: "Following the contrast incident, I was subjected to
repeated unwarranted criticism by my manager Judith Ierardi."

¶ 25: "The second final warning which alleges that I did not
communicate with an MRI Aide and other staff members in a
respectful collaborative manner is completely false and pre-
textual.  I have always worked in a respectful and collaborative
manner with all staff members."

¶ 27: "On October 4, 2013, I was called into another meeting and
once again was subjected to additional false accusations about
my job performance which were all a pretext to fire me. . . .  I
was also reprimanded for leaving at the end of my shift when
there was another patient to scan.  Once again this was a false
and unwarranted criticism. . . .  I was also reprimanded for
failing to remove duplicate orders from the computer systems and
failing to perform normal stocking and cleaning duties which are
completely false."

¶ 28: "The allegations made against me in the October 4, 2013
meeting were completely false and were just another effort by
Judith Ierardi to harass me into quitting my job."

¶ 30: "On October 11, 2013, St. Elizabeth's wrongfully
terminated my employment without just cause. . . .  St.
Elizabeth's breached the Collective Bargaining Agreement by
terminating my employment without just cause.  I have read that
one of the reasons that I was fired is that I refused to attend
my PIP meetings.  This statement is completely false."

¶ 46: "At the April 23, 2005 [sic] hearing, both Bruce Fleischer
and Mary Ellen LeVeille told the appeal panel that the contrast
incident was a fire-able offense and that the union had saved my
job.  This was completely false."

Mr. Reynolds indicates that many of the incidents described
in the above paragraphs were "unwarranted," "pretextual," or
"completely false."  Without more, I find these statements are
conclusory; Mr. Reynolds's affidavit has not provided me with
specific factual knowledge to support his statements.

Furthermore, it does not escape me that Mr. Reynolds does not specifically challenge Defendants' contentions regarding the grounds on which these specific paragraphs should be stricken. Therefore, to the extent that Mr. Reynolds's affidavit includes such conclusory statements not based upon personal knowledge, those statements will be given no weight in opposition to Defendants' motion for summary judgment.

## B.    *Defendants' Motions for Summary Judgment*

Each Defendant filed a separate motion for summary judgment.  The Union argues that summary judgment is appropriate because the cause of action arose more than six months prior to filing the complaint and is therefore barred by the statute of limitations.[6]  Alternatively, the Union contends that its motion for summary judgment should be granted because the undisputed

---

[6] The Union accepts it did not plead the statute of limitations as an affirmative defense in its Answer, as required by Fed. R. Civ. P. Rule 8(c).   [Dkt. No. 51 at 4].   Despite this, I do not find that the Union waived the defense.  *See Saucier v. Warden, New Hampshire State Prison*, 215 F.3d 1312 (1st Cir. 2000)  (unpublished opinion) (per curiam) (no waiver of statute of limitations defense as plaintiff did not assert any prejudice attributable to the late raising of the defense).  Here, there is no prejudice because the co-defendant, the Hospital, had already raised the affirmative defense of statute of limitations in its Answer to Mr. Reynold's complaint.  *See Ringuette v. City of Fall River,* 146 F.3d 1, 4 (1st Cir. 1998) (failure to raise affirmative defense in answer did not prejudice plaintiff as co-defendant raised it in their answer and plaintiff's position as to affirmative defense was the same as to both defendants).   As a result, Mr. Reynolds was already on notice and therefore the Union's failure to plead was therefore "harmless".  *See In re Cumberland Farms, Inc.,* 284 F.3d 216, 226 (1st Cir. 2002).

facts establish that the Union did not breach its duty of fair representation.  Specifically, the Union claims that it adequately investigated Mr. Reynolds's grievance and properly represented him at all stages of the grievance procedure and that its decision not to advance Mr. Reynolds's grievance to arbitration falls within the Union's broad discretion.

For its part, the Hospital argues at the threshold that Plaintiff's claim is barred by the six-month statute of limitations.  The Hospital also argues that the Union did not breach its duty of fair representation and that it did not breach the CBA.  The Hospital specifically claims that there is no evidence that it discharged Mr. Reynolds without just cause in violation of the CBA.

Because the two motions are mutually reinforcing, I will address the contentions by topic and not separately as to the respective defendants.

1.   Statute of Limitations

The six-month statute of limitations prescribed by § 10(b) of the National Labor Relation Act applies to hybrid actions, such as the current case.  *See DelCostello* v. *International Brotherhood of Teamsters*, 462 U.S. 151, 170-72(1983); *Adorno* v. *Crowley Towing & Transp. Co*., 443 F.3d 122, 126 (1st Cir. 2006); *Graham* v. *Bay State Gas Co*., 779 F.2d 93, 94 (1st Cir. 1985). "A hybrid action is one in which a union member brings a section

301 claim against his or her employer and a duty of fair representation claim against the union." *Graham*, 779 F.3d at 94. Such a cause of action in a hybrid claim "arises when the plaintiff knows, or reasonably should know, of the acts constituting the union's alleged wrongdoing." *Id.* (citation omitted).

Mr. Reynolds filed the operative complaint on March 15, 2016.

### *a. When the Cause of Action Arose*

The first inquiry in determining whether Mr. Reynold's claims are time barred is determining when his cause of action arose.

On May 27, 2014, the Union informed Mr. Reynolds that it decided not to pursue his termination grievance to arbitration and notified him of his right to appeal that decision. By September 17, 2014, Mr. Fleischer, on behalf of the Union, and the Hospital had reached a tentative settlement that the Union considered reasonable. Mr. Reynolds did not respond to Mr. Fleischer's attempt to contact him regarding the settlement. Rather, on September 23, 2014, by letter, Mr. Reynolds, through his counsel, accused the Union of a breach of its duty of fair representation "by failing to properly pursue his grievance against St. Elizabeth's Health Center."

A similar situation was presented in *Graham* where the
"appellant had notice of the union's alleged wrongdoing no later
than March 2, 1982, about ten months before he filed suit."   779
F.2d at 94.   On that date, "the appellant had actual notice of
the acts constituting the union's alleged wrongdoing . . . when
his wife met with the [defendant's] officer . . . [and] after
being told that the union would not get involved in her
husband's case, [she] told the . . . officer that she and her
husband would seek legal representation."   *Id*.   Consequently,
the First Circuit concluded that the appellant's action was time
barred.   *Id*.

Similarly, in *Silva* v. *Steelworkers' Union Local 8751*, Civ.
No. 13-13051-GAO, 2017 WL 1227923, at *1 (D. Mass. Mar. 31,
2017), Judge O'Toole found that the cause of action arose when
plaintiff's lawyer sent a letter to the defendant Union
explicitly threatening to bring a claim before the National
Labor Relations Board and in Federal Court for breach of its
duty of fair representation.   Judge O'Toole  held this letter
"establishe[d] [not only] that the plaintiff reasonably should
have known of omissions to act that would support a plausible
claim of breach of the duty, but that he actually did know."   *Id*.
Accordingly, since the action was commenced more than six months
after that letter, he granted the union's motion for summary
judgment as the cause of action was time barred.   *Id*.

By sending the September 23, 2014, letter, Mr. Reynolds's counsel did precisely what plaintiff's counsel did in *Silva*. Accordingly, Mr. Reynolds had notice of the Union's alleged wrongdoing no later than September 23, 2014 date, approximately 18 months before Mr. Reynold's filed the complaint before me.

> *b. Tolling*

The second inquiry is to determine whether, and to what extent, Mr. Reynold's cause of action was tolled.

As soon as "the statute of limitations begins to run, it may be tolled while an employee is pursuing formal or required intra-union procedures." *Yordan* v. *Am. Postal Workers Union, AFL-CIO*, 293 F.R.D. 91, 97 (D.P.R. 2013) (citations omitted). However, a "plaintiff must make diligent efforts to pursue internal appeals to toll the statute." *Id*. at 98 (citations omitted).  Pursuing an internal appeal only has the effect of tolling the statute of limitations and does not entitle a plaintiff to a new six-month period afterwards.  *Howell v. Gen. Motors Corp.*, 19 F. App'x 163, 168 n.5 (6th Cir. 2001).

Additionally, the filing of a complaint that is subsequently dismissed does not toll the statute of limitations. *See Jorge* v. *Rumsfeld*, 404 F.3d 556, 563 (1st Cir. 2005) ("A voluntary dismissal without prejudice results in a *tabula rasa*. It renders the proceedings null and void and leaves the parties in the same position as if the action had never been

41

prosecuted.") (citation omitted).   Thus, the statute of
limitations was not tolled by Mr. Reynolds filing his first
complaint on January 6, 2015 which was subsequently voluntarily
dismissed on April 14, 2015.

Between the September 23, 2014 letter (when the cause of
action arose) and April 14, 2015 (when the parties agreed to
proceed with Mr. Reynold's internal appeal in exchange for the
voluntary dismissal of Mr. Reynold's first complaint), more than
6 and a half months has elapsed.   This is enough to bar Mr.
Reynold's claims.

While it is true that Mr. Reynold's initiated the internal
appeals process in June 2, 2014, I do not find that his internal
appeals process had any tolling effect between September 23,
2014, and April 14, 2015.   This is due to the fact he was not
diligently pursuing his internal appeals process, but was,
rather, seeking redress through litigation.   It was only after
voluntarily dismissing his first complaint that he diligently
pursued the appeals process and tolling began.   By that time,
however, more than six months had elapsed,[7] and the courthouse
doors had presumptively closed.   Thus, I find that Mr. Reynolds'
claim is time barred.   Notwithstanding my decision regarding the

---

[7] Moreover, more than another five months passed between
September 23, 2015 (when he exhausted his internal appeals
process) and March 15, 2016, when he filed the complaint
initiating this case.

preclusive effect of the statute of limitations, in the interest
of completeness, I will analyze Mr. Reynolds's substantive
claims below.

### 2.  The Hospital's Breach of the CBA

Mr. Reynolds contends, without significant citation to the
record, that there is overwhelming evidence that his termination
by the Hospital was without just cause and, therefore, violated
the CBA.  He indicates that "[t]here is little doubt that [he]
was terminated as a result of the Contrast Incident."  He
maintains that, following the Contrast Incident, Ms. Ierardi
made it clear that she wanted to terminate him and everything
that occurred after the incident was merely pretext to support
his wrongful termination.  He states that he was "the
scapegoat," and from that point on, Ms. Ierardi "engaged in an
obvious scheme to harass [him] into quitting his job and when
she set about establishing a record of bogus claims of
wrongdoing."

It is well settled that "[w]hether the undisputed facts in
a specific case establish — or fail to establish — proper cause
for discharge within the contemplation of a given CBA is a
question of law (and, thus, a question for the court)."
*Mulvihill*, 335 F.3d at 22 (citation omitted).  "[T]he question
of whether proper cause exists to sustain the employee's

discharge intersects with the question of whether the record contains substantial evidence." *Id*.

Under the CBA here, the Hospital had the right to discipline, suspend or discharge a worker for just cause.  The record demonstrates that Mr. Reynolds was terminated for failing to comply with the PIP that was put in place as a result of the pattern of escalating performance deficiencies following a three-month period during which Mr. Reynolds was issued two separate Final Warnings.  The record was developed after the Hospital received complaints from staff members and patients. Mr. Reynolds attempts to excuse his alleged deficiencies but fails to confront the fact that these events, nevertheless, occurred.

The Hospital gave Mr. Reynolds ample opportunity to show improvement, however, he failed to do so.  The Hospital had just cause to terminate Mr. Reynolds, who had received two Final Warnings in the course of less than three months and repeatedly refused to comply with the terms of his PIP.

I find that there is substantial evidentiary support to sustain the Hospital's decision to terminate Mr. Reynolds. Consequently, I conclude that there was no breach of the CBA and I will grant the Hospital's motion for summary judgment with respect to the count against it.

### 3.    The Union's Breach of its Duty of Fair Representation

Mr. Reynolds contends that there is substantial evidence that the Union breached its duty of fair representation in both handling his grievance and in refusing to arbitrate his grievance.

A labor union has "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes*, 386 U.S. 171, 177 (1967) (citation omitted).

The "duty of fair representation mandates that a union conduct at least a 'minimal investigation' into an employee's grievance." *Emmanuel* v. *Int'l Bhd. of Teamsters, Local Union No. 25*, 426 F.3d 416, 420 (1st Cir. 2005) (citation omitted). "A Union breaches this duty only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Miller*, 985 F.2d at 11. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* at 12 (internal quotation marks and citations omitted). Under this standard, a union is permitted wide discretion, and a court's review of the union's conduct is "highly deferential". *Miller* v. *U.S. Postal*

*Serv.*, 985 F.2d 9, 12 (1st Cir. 1993) (citations omitted).  "It is for the union, not the courts to decide whether and in what manner a particular grievance should be pursued."  *Emmanuel*, 426 F.3d at 421 (quoting *Patterson* v. *Int'l Bhd. of Teamsters, Local 959,* 121 F.3d 1345, 1349–50 (9th Cir. 1997)); unions are given "great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it." *Miller,* 985 F.2d at 12.

I find the Union acted well within its wide range of reasonableness inasmuch as it investigated the underlying facts of Mr. Reynolds's termination, appropriately advocated on his behalf during all steps of the grievance procedure, and acted well within its broad discretion when it decided not to pursue Mr. Reynolds's grievance to arbitration.

Contrary to Mr. Reynolds's claims, the record shows that the Union handled his grievance adequately.  Indeed, despite the fact that the Hospital had just cause to terminate his employment, discussed *supra*, the Union was successful in negotiating a settlement agreement on behalf of Mr. Reynolds.

Mr. Reynolds tries to pick holes in the Union's representation. For example, he asserts that Ms. Leveille apparently conceded to the Hospital giving him a Final Warning. But he fails to recognize that this was effective advocacy to secure his continued employment with the Hospital.  In any

event, Ms. Leveille made clear to Ms. Ierardi that the Union would vigorously challenge termination should the Hospital discharge Mr. Reynolds.

Additionally, Mr. Reynolds also labels Ms. Knehans "a woefully unprepared delegate" because at the July 26, 2013, meeting she made no effort to argue on his behalf and that she did not file a grievance on his behalf after he requested. However, in his deposition testimony, Mr. Reynolds made it clear that he did not ask the Union to grieve either of his two Final Warnings.  He takes fault with her lack of knowledge of filing a grievance.  However, as he indicated in his deposition, Mr. Reynolds did not ask for one to be filed, and as a result I cannot say that Ms. Knehans' conduct was so far outside a wide range of reasonableness as to be irrational.

Additionally, Mr. Reynolds contends that Mr. Fleischer failed to take any steps to investigate the Contrast Incident. But Mr. Reynolds did not grieve the first Final Warning concerning that matter.  The record demonstrates that Mr. Fleischer investigated as much was necessary.  For example, during the grievance proceedings, Mr. Fleischer had several conversations with the parties involved in the matter, including Mr. Reynolds, Ms. Knehans, Mr. Bezza, Ms. Ierardi, and Ms. O'Neill.  Moreover, it is undisputed that Mr. Reynolds's grievance was properly and timely advanced to both Step 2 and

47

Step 3 of the grievance procedure.  Specifically, for the Step 2
meeting, Mr. Fleischer reviewed the entirety of Mr. Reynolds's
disciplinary history since the contrast incident and addressed
each allegation to argue that the Hospital did not have just
cause to terminate Mr. Reynolds.  Mr. Reynolds testified that
Mr. Fleischer "seemed very sympathetic to the situation, and he
was the first one from the union that had seemed to see the
logic in [his] complaint."  Mr. Reynolds initially felt
supported by Mr. Fleischer.  For Step 3, Mr. Fleischer again
reviewed the entirety of Mr. Reynolds's disciplinary history
since the contrast incident and addressed each allegation to
argue that the Hospital did not have just cause to terminate Mr.
Reynolds.  Mr. Reynolds testified that he felt Mr. Fleischer's
presentation was full and fair on his behalf.  He also testified
that he had the opportunity to give his side of the story in his
own words.

Having taken the entire record under consideration, I find
that the Union conducted well more than a minimum investigation
on behalf of Mr. Reynolds.  I cannot conclude that the Union's
actions here are arbitrary because I do not find the Union's
behavior to be outside a wide range of recognized
reasonableness, or otherwise irrational.

Finally, Mr. Reynolds further objects to the Union's
refusal to take his case to arbitration.  However, he fails to

recognize that "[a] union is under no duty to arbitrate a grievance that it honestly and in good faith believes lacks merit." *Chaparro-Febus* v. *Int'l Longshoremen Ass'n*, *Local 1575*, 983 F.2d 325, 331 (1st Cir. 1992) (citation omitted).  Rather, if a union were forced to arbitrate "a case that it felt had little basis in the contract, it arguably would jeopardize its credibility with the employer for purposes of later, more supportable, disputes with management policies, instituted on behalf of all members." *Berrigan* v. *Greyhound Lines, Inc.*, 782 F.2d 295, 298 (1st Cir. 1986).

The record here demonstrates that the Union spent considerable time on Mr. Reynolds's case and adequately represented his interests up until the time it, in good faith, believed his case lacked merit and could not succeed at arbitration.

Mr. Reynolds was a short-term employee with two Final Warnings on his record.  He was additionally placed on a PIP that required him to maintain a respectful rapport with the Hospital staff and patients, provide patients with prompt and professional service, refrain from creating and disseminating documents listing duties in an attempt to direct the work of his colleagues over whom he had no supervisory authority, and to meet with his supervisor weekly to review his progress.  Mr. Reynolds failed to improve.  He was ultimately terminated for a

pattern of escalating performance deficiencies and his refusal
to attend future review sessions, thereby violating the
essential elements of the PIP.

Rather than acknowledging the deficiencies with his
employment conduct, Mr. Reynolds takes the conclusory position
that the Union's "refusal to arbitrate [his] grievance was not
in good faith and was most likely motivated by the fact that
[he] had made a complaint to the NLRB." This speculative
statement, without more, does not reframe my analysis. I
recognize that he claims Ms. Eckstein stated, "you expect the
Union to help you after you filed a complaint with the NLRB."
This statement is without meaningful significance. There is no
evidence to suggest that Mr. Eckstein had a role in deciding the
outcome of Mr. Reynold's appeals or that Mr. Reynolds was not
afforded fair, impartial hearings. Instead, the record fully
establishes that the Union did take all justifiable steps to
assist him.

I find that the Union acted well within the broad
discretion afforded it in determining the merits of a grievance.
I conclude that the decision not to arbitrate Mr. Reynolds's
claim did not violate the Union's duty of fair representation
and I find no error with said decision. Therefore, I grant
Defendants' motion for summary judgment with respect to this
count.

## IV. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendants' joint motion [Dkt. No. 42] to strike be GRANTED IN PART and DENIED IN PART, and that Defendants' motions [Dkt. Nos. 29 and 31] for summary judgment be GRANTED.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE